**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-1212
_____

RACHEL SPIVACK,
                Appellant

v.

CITY OF PHILADELPHIA; LAWRENCE S. KRASNER
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-22-cv-01438)
District Judge: Honorable Paul S. Diamond
_____

Argued on November 29, 2023

Before: KRAUSE, FREEMAN, and MONTGOMERY-
REEVES, *Circuit Judges*

(Opinion filed: July 29, 2024)
_____

Justin Butterfield
David J. Hacker

Lea E. Patterson   [**ARGUED**]
First Liberty Institute
2001 W Plano Parkway
Suite 1600
Plano, TX 75075

    *Counsel for Appellant*

Craig R. Gottlieb
City of Philadelphia Law Department
1515 Arch Street
17th Floor
Philadelphia, PA 19102

    *Counsel for Appellee City of Philadelphia*

Anne E. Kane
David Smith   [**ARGUED**]
Dilworth Paxson
1500 Market Street
Suite 3500E
Philadelphia, PA 19102

    *Counsel for Appellee Lawrence S. Krasner*

_____

## OPINION OF THE COURT
_____

**FREEMAN**, *Circuit Judge*.

Rachel Spivack worked at the Philadelphia District Attorney's Office (DAO) and was subject to its COVID-19 vaccine mandate.  The DAO denied her request for a religious

exemption, and she lost her job. She then sued the City of Philadelphia and District Attorney Lawrence Krasner, claiming that the mandate violated her constitutional right to the free exercise of religion. The District Court rejected that claim, granting the defendants' motions for summary judgment and denying Spivack's cross-motion. Because it overlooked factual disputes that a jury must resolve, we will vacate its order and remand the case for trial.

**I**

**A**

In March 2020, the COVID-19 pandemic severely disrupted the DAO's operations. Although the office adapted, it faced serious constraints: the criminal justice system could not shut down, and some of the DAO's responsibilities could be accomplished only in person.

Krasner responded to the pandemic by instituting a series of policies governing building access, masking, testing, and quarantine after exposure. He issued these policies under his broad authority to manage the office as an independently elected official. To develop the policies, he relied on guidance from the Centers for Disease Control and Prevention, the Philadelphia Department of Public Health, and a small team of advisors, including Michael Lee, his Chief of Staff; Cecilia Madden, his Deputy Chief of Staff; and his two First Assistant District Attorneys, Robert Listenbee and Carolyn Temin.

Some of the DAO's COVID-19 policies lined up with the City's, but others did not. Krasner believed that the City was politically constrained to enact suboptimal rules that did not maximize employee and public health. So he charted his

own course, driven by a conviction that the DAO's public safety mission required it to protect from infection its own employees, their families, and the people they encounter in the criminal justice system, including defendants, crime victims, defense lawyers, judges, and court staff.

Given the setup of the DAO, Krasner's policymaking authority did not extend to all DAO employees. The line prosecutors in the office, known as Assistant District Attorneys (ADAs), are non-unionized, at-will employees who serve at the DA's pleasure. Some other DAO employees, however, are members of municipal employee unions. For instance, several Philadelphia Police Department officers are assigned to the DAO, and they belong to the City's police union. Similarly, some civil servants working in administrative roles at the DAO belong to a public employee union. These workers' terms of employment are governed by collective bargaining agreements between their unions and the City.

For about a year after the onset of the pandemic, the office operated in limbo, with many of its employees working a remote or hybrid schedule. Once vaccines became widely available in spring 2021, Krasner and his advisors began to discuss how to safely revert to in-office work.

B

Spivack graduated from law school in spring 2021, and the DAO offered her an ADA position beginning that September. The offer specified: "Your employment in this position is exempt from Civil Service and is considered 'at-will,' which means you serve at the pleasure of the District Attorney." App. 39. She accepted the offer, signing a form that reiterated the at-will nature of the position and affirmed

her understanding that her "employment, future unit assignments, duration of assignments, transfers, and any salary increases are completely within the discretion of the District Attorney." App. 41–42.

In preparation for her employment at the DAO, Spivack registered to take the Pennsylvania bar exam remotely in July 2021. Ultimately, she did not comply with the remote testing requirements and could not take the exam. She shared this news with Madden, who told her that the DAO would assign her to an ADA position that did not require a license to practice law in Pennsylvania. In September 2021, Spivack started working in that capacity in the DAO's Juvenile Diversion Unit.

C

About a month before Spivack's start date, the DAO issued the initial version of its COVID-19 vaccine mandate ("the August 2021 policy"). Madden developed the policy in consultation with Krasner, who ultimately approved it.

The August 2021 policy required "[a]ll DAO employees . . . to provide proof of vaccination or apply for an exemption by September 1, 2021." App. 51. It did not offer any alternatives to vaccination, such as masking or testing. But it set out a process to apply for medical or religious exemptions: employees could fill out a form with a description of the requested exemption and the reasons it should be granted. Religious exemptions would be granted "absent undue hardship, to employees with verifiable, sincerely held religious beliefs, observances, or practices that conflict with getting vaccinated." App. 52. Exemption requests would be evaluated "on a case-by-case basis considering various factors and based on an individualized assessment in each situation."

*Id.* The policy also said that "[t]he DAO will engage in an interactive dialogue with you to determine the precise limitations of your ability to comply with this . . . policy and explore potential reasonable accommodations that could overcome those limitations." App. 53. This decision to permit requests for exemptions was based on "the employment law knowledge at the time that issuing this kind of mandate allows for some process for requesting exemptions." App. 166. Because unionized DAO employees like police officers and civil service workers were governed by their collective bargaining agreements, they were not subject to the policy.

The DAO implemented the August 2021 policy for several reasons. Top of mind were the risks to life and health posed by COVID-19. Several members of DAO leadership knew people who died from the disease. They were concerned about particularly vulnerable employees, including elderly employees and those with preexisting medical conditions, and employees' family members, including young children who were not yet eligible for vaccination. They also wanted to prevent COVID-19 outbreaks that could disrupt the office and undermine its ability to function, particularly as the court system reopened. Relatedly, they hoped to convince employees who were reluctant to return to the office that in-person work would be safe.

Krasner also considered alternatives to a mandate and found them insufficient. He thought a weekly testing regime would impose a large administrative burden on the office yet provide incomplete information. He believed a masking requirement would be difficult to enforce, and he had no authority or budget to change the ventilation system in the DAO's office building.

D

Spivack received notice of the August 2021 policy shortly before her first day at the DAO.  In September 2021—within a week of starting work—she submitted a religious exemption request with a supporting letter from her rabbi.  The letter stated that Spivack belongs to the rabbi's congregation, that she "is an orthodox Jew who is fully observant of Scriptural and rabbinic laws and guidance," App. 54, and that her "religious grounds for declining this vaccination are valid and reflect deep personal commitment to her religious practice," App. 56–57.

In December 2021, Madden emailed all recent hires who had not yet submitted proof of vaccination, including Spivack.  The email instructed those seeking medical or religious exemptions from the mandate to complete and return an exemption form.  It attached a form that asked applicants to "describe the specific belief that supports your receiving a religious exemption from being vaccinated for COVID-19." App. 60.  The form also asked about the applicant's vaccination history, history of receiving religious exemptions from vaccination requirements, membership in an organized religion, affiliation with a religious congregation and attendance at religious services, and religious beliefs about diet and medical care.  Madden and Krasner both testified that, when they distributed the form, they had not yet decided how to handle religious exemptions.

Spivack completed the detailed form and returned it to Madden.  She wrote that "[a]ll three available brands of COVID-19 vaccines constitute a profound violation of the scriptural prohibitions against forbidden mixtures," and that "[i]njecting such forbidden substances directly into our

bloodstream completely challenges scriptural teaching that regards one's body as the repository of the soul made in God's image." App. 60–61. She noted that her religious beliefs preclude receiving any vaccine (not just the COVID-19 vaccine), that she had not received any vaccines in the past ten years, and that she was exempted from her law school's vaccination requirement.[1] She also explained that there are diverse beliefs about vaccination within the Orthodox community: because "Orthodox Judaism does not have a single central authority" and "[m]any decisions related to modern medical treatment and Jewish law require interpretation and extrapolation from ancient sources," different Orthodox rabbis "may come to different, but equally valid, rulings about a course of action." App. 64.

E

In January 2022—after Spivack submitted her exemption form and supporting documentation, but before she received a decision—Madden and Krasner claim that the DAO made a policy change. Rather than offering religious exemptions and evaluating them case-by-case, as the August 2021 policy provided, Krasner decided to categorically deny religious exemption requests without individualized assessment.[2] He opted to implement this new policy ("the

---

[1] As evidence of her exemption from her law school's vaccination requirement, Spivack attached the form she submitted in support of that exemption request.

[2] The City, by contrast, allowed religious exemptions case-by-case. When the City approved an exemption, it would forward that determination to the relevant employee's department.

January 2022 policy") after conducting legal research and determining that the law did not require religious exemptions to a vaccine mandate. He also considered the emergence of the Omicron variant of COVID-19, which caused a surge of cases in December 2021 and January 2022, and his discomfort with the prospect of adjudicating the sincerity of his employees' religious beliefs.

Krasner testified that he established the January 2022 policy before reading any of the exemption requests. Although he made the final decision to implement this new policy, he consulted his senior advisors before making the change.

The record invites some questions, however, about the exact terms of the policy change or whether a change was made at all. No evidence shows that the January 2022 policy was committed to writing or disseminated to DAO staff. (By contrast, the August 2021 policy was written down and addressed in emails to staff.) Listenbee, the First Assistant DA, testified that there was no change in the policy and that Krasner still reviewed all religious exemption requests on an individualized basis after January 2022. Krasner also admitted

---

Exempted employees had to double mask and undergo routine testing. But the implementation of these requirements was left to the discretion of each department. The record reveals that some DAO employees erroneously forwarded their exemption requests to the City, which processed them. Spivack, however, never sent any information to the City, so it never adjudicated her exemption request. Krasner testified that he disagreed with the City's policy "[b]ecause it presents yet another public . . . health obstacle in the middle of an international pandemic within the walls of my office." App. 348.

that he reviewed the religious exemption requests, though he says that he did so only out of respect for the time employees devoted to preparing them. In any event, Krasner denied Spivack's exemption request.

F

Spivack learned that her exemption request was denied at a meeting in March 2022. Madden led the meeting and conveyed the denial by reading from a prepared script. She declined to explain the decision further and did not tell Spivack that the DAO was categorically denying religious exemption requests.

Several days later, Spivack received a formal denial letter signed by Madden. The letter explained that Spivack's exemption request was denied "for failing to meet legal requirements." App. 66. It included a "Legal Analysis" claiming that the mandate was neutral and that exemptions would cause an undue burden. App. 66–67. It also stated the following:

> In addition to the law permitting the DAO's neutral COVID-19 vaccine policy and not requiring accommodations if they constitute an undue burden for the DAO, Rachel Spivack does not present a credible claim that their opposition to the vaccine was based on their religious beliefs. The fact that an individual is religiously devout does not by itself qualify them under the law for a religious exemption. DAO has not designated which currently approved COVID-19 vaccine an employee must take. Consequently, to the extent an employee opposes how the

vaccine was manufactured, they have other COVID-19 vaccines from which to choose.

App. 67. Though this passage references Spivack by name, it bears the indicia of a form letter: it uses gender-neutral pronouns, and Spivack's name was entered on a blank line. It also does not address the contents of Spivack's exemption request form (which explained, among other things, that taking any of the available COVID-19 vaccines would violate her religious beliefs). Krasner testified that the letter does not reflect the January 2022 policy, that it was drafted before he eliminated the religious exemption, and that he did not review it before Madden sent it to Spivack.

In addition to the letter from Madden, Spivack received a letter from Lee, the Chief of Staff, informing her that, because her exemption request had been denied, she would be placed on leave if she did not get vaccinated. She then met with Listenbee to ask whether there was any way to keep her job without getting vaccinated. Listenbee told her that he was unaware of any workarounds. Spivack claimed that she offered to mask indefinitely in the office and test weekly, but that Listenbee "refused to engage." App. 496. Spivack also asked Jordan King, the head of the Juvenile Diversion Unit and her immediate supervisor, about a remote work arrangement, but DAO leadership told King that such an arrangement was unavailable.

Several weeks later, Madden emailed Spivack to tell her that the DAO would "separate [her] from service" effective

11

April 8 if she did not get vaccinated.    App. 69.    Spivack
remained unvaccinated, and she was terminated on April 8.[3]

### G

Spivack sued Krasner and the City in April 2022.    She
claimed that the DAO's vaccine mandate violated the First
Amendment's Free Exercise Clause and the Pennsylvania
Religious Freedom Protection Act.

The parties engaged in discovery, including depositions
of Krasner, Madden, Listenbee, and Spivack.    After discovery
concluded, the District Court granted Krasner's and the City's
motions for summary judgment and denied Spivack's cross-
motion.    It held that the mandate was neutral and generally
applicable and therefore subject to rational basis review.
Applying that standard, the District Court held that the
mandate was constitutional because it was rationally related to
the DAO's interests in curtailing the spread of COVID-19,
avoiding staffing shortages, and reducing the risk of death and
serious illness among DAO staff and the public.    In the
alternative, it held that the mandate satisfied strict scrutiny.
The Court also dismissed Spivack's state law claim for lack of

---

[3] If Spivack had continued her employment at the DAO, she
would have been transferred to the Municipal Court Unit in
April 2022, after she passed the February 2022 bar exam.    That
job requires in-person work: ADAs in the unit spend five days
a week in court, where they interact with police officers,
defense counsel, judges, and court staff.    After finishing court
proceedings in the middle of the afternoon, they work in the
office with colleagues for the rest of the day, and often into the
evening.

jurisdiction.  Spivack appealed the resolution of her Free Exercise Clause claim only.[4]

## II

The District Court had jurisdiction over the Free Exercise Clause claim under 28 U.S.C. § 1331.  We have appellate jurisdiction under 28 U.S.C. § 1291.

"We review de novo the District Court's resolution of cross-motions for summary judgment." *Stradford v. Sec'y Pa. Dep't of Corr.*, 53 F.4th 67, 73 (3d Cir. 2022).  A grant of summary judgment is appropriate only "if, when viewed in the light most favorable to the [nonmoving party], there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 580 (3d Cir. 2003).  A dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At this stage, "[o]ur role is to determine whether there is a genuine issue for trial[,] . . . not . . . to weigh the evidence

---

[4] Spivack appeals from the order resolving all three parties' motions for summary judgment on the Free Exercise Clause claim.

The City moved to be excused from appellate briefing because it agreed with the brief filed by Krasner, and this Court granted that motion.  Accordingly, the City asserted no additional defenses to Spivack's claims in this appeal.

and determine the truth of the matter." *Peroza-Benitez v. Smith*, 994 F.3d 157, 164 (3d Cir. 2021) (cleaned up).[5]

## III

The Free Exercise Clause of the First Amendment states that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. This constitutional provision applies to state and local governments through the Fourteenth Amendment. *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). To protect religious liberty, the Free Exercise Clause does more than guard "the right to harbor religious beliefs inwardly and secretly." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). Instead, it "does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Id.* (cleaned up).

Not all restrictions on religious exercise are presumptively unconstitutional, however. Because many government policies incidentally burden religious practice, routinely exempting citizens from laws meant to apply to everyone would risk "permit[ting] every citizen to become a law unto himself." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (citation omitted). Yet we

---

[5] When, as here, both parties move for summary judgment, courts "must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the [summary judgment] standard." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citation omitted).

must closely scrutinize policies that single out "religious conduct for distinctive treatment." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *see also id.* at 532 ("[I]t was historical instances of religious persecution and intolerance that gave concern to those who drafted the Free Exercise Clause." (cleaned up)). The Supreme Court sought to accommodate these competing imperatives in *Employment Division v. Smith*, instructing that the Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability." 494 U.S. at 879 (cleaned up).

Under *Smith*, we therefore apply sharply divergent standards of scrutiny based on whether a law or policy is neutral and generally applicable. *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002). Government policies that are both neutral and generally applicable are subject to rational basis review—a deferential standard that only requires the government's action to be *rationally related* to a *legitimate* interest. *Id.* at 165 n.24. By contrast, policies that are not neutral or not generally applicable trigger strict scrutiny—a far more exacting standard that demands the government show that its actions were *narrowly tailored* to further a *compelling* interest. *Id.* Put differently, we evaluate neutral and generally applicable policies under an easily satisfied, though not toothless, standard of scrutiny, but we subject policies that fail to be neutral or generally applicable to the closest examination. Whether a policy is constitutional often hinges on which standard applies.

This case illustrates the importance of the standard. All parties to this appeal agree that Spivack refused the COVID-19

vaccine based on her sincere religious beliefs and that the DAO's vaccine mandate burdened her religious exercise. The main dispute, then, is whether the mandate is neutral and generally applicable.

A government policy is neutral if it does not "restrict[] practices because of their religious nature" or evince "intoleran[ce] of religious beliefs." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021). And a policy is generally applicable so long as it does not either "provid[e] a mechanism for individualized exemptions" or "prohibit[] religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.* at 533–34 (cleaned up).

"Neutrality and general applicability are interrelated," and a government policy that fails one prong of the *Smith* test will often fail the other. *Lukumi*, 508 U.S. at 531. This is because both inquiries inform the same fundamental question: does the policy single out religious practices for distinctive treatment? *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017) ("The Free Exercise Clause . . . subjects to the strictest scrutiny laws that target the religious for special disabilities based on their religious status." (cleaned up)). To answer this question, we search for anti-religious animus on the face of the policy itself and in the circumstances of its enactment. But we also look for subtler signs that policymakers targeted religion. For instance, arbitrary distinctions between religious and secular conduct suggest anti-religious bias. Likewise, open-ended, discretionary exemptions permit government officials to mask discrimination against religion. *See Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d

Cir. 2007) (treating a system of individualized exemptions as "suspicious" because "certain violations may be condoned when they occur for secular reasons but not when they occur for religious reasons").

Despite their interrelatedness, the two inquiries are analytically distinct. The neutrality inquiry, with its focus on the purpose of or motivation behind a policy, asks us to examine policymakers' subjective intent. *See We the Patriots USA, Inc. v. Conn. Off. of Early Childhood Dev.*, 76 F.4th 130, 149 (2d Cir. 2023) ("*We the Patriots II*") ("[T]he Supreme Court has used a consistent cluster of terms to describe the kind of official attitude that violates the neutrality prong of *Smith*— 'hostility,' 'animosity,' 'distrust,' 'a negative normative evaluation.'" (citation omitted)); *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County*, 915 F.3d 256, 265 (4th Cir. 2019) (describing non-neutrality as the presence of a "discriminatory motive"). The general-applicability inquiry, by contrast, focuses on the objective sweep of a policy: whom it covers, whom it exempts, and how it makes that distinction. *See Fulton*, 593 U.S. at 533–34.

Here, the District Court held that the DAO's vaccine mandate was both neutral and generally applicable as a matter of law, and therefore subject to rational basis review. We disagree. The summary judgment record reveals two disputes of material fact that affect the neutrality and general-applicability analyses: (1) whether comments Krasner made in a deposition evinced anti-religious bias, and (2) whether Krasner evaluated Spivack's exemption request under the August 2021 policy (which provided for individualized, discretionary religious exemptions) or the January 2022 policy

(which did not).   A jury must resolve these disputes to
determine which standard applies.

## A

We begin with neutrality.   "Government fails to act
neutrally when it proceeds in a manner intolerant of religious
beliefs or restricts practices because of their religious nature."
*Fulton*, 593 U.S. at 533.  To decide whether a policy is neutral,
we first consider the text of the challenged law or policy, since
"the minimum requirement of neutrality is that a law not
discriminate on its face." *Lukumi*, 508 U.S. at 533.  We also
weigh "the historical background of the decision under
challenge, the specific series of events leading to the enactment
or official policy in question, and the legislative or
administrative history, including contemporaneous statements
made by members of the decisionmaking body." *Id.* at 540.
Even "subtle departures" from religious neutrality are
forbidden. *Id.* at 534 (citation omitted).

Both the August 2021 and January 2022 policies are
facially neutral.  The August 2021 policy required "[a]ll DAO
employees . . . to provide proof of vaccination or apply for an
exemption by September 1, 2021." App. 51; *see Kane v. De
Blasio*, 19 F.4th 152, 164 (2d Cir. 2021) (holding that a vaccine
mandate was facially neutral because "[i]t applie[d] to all DOE
staff" (internal quotation marks omitted)).  The January 2022
policy—which provided for only medical exemptions but
otherwise mirrored the August 2021 policy—similarly applied
to all DAO employees. *See M.A. ex rel. H.R. v. Rockland Cnty.
Dep't of Health*, 53 F.4th 29, 37 (2d Cir. 2022) ("[The policy]
is facially neutral in that it applies to all unvaccinated children,
but for two limited exceptions . . . .").   Neither policy
"single[d] out employees who decline vaccination on religious

grounds." *Kane*, 19 F.4th at 164; *cf. Combs v. Homer-Ctr. Sch. Dist.*, 540 F.3d 231, 242 (3d Cir. 2008) (holding that a policy was neutral because "it imposes the same requirements on parents who home-school for secular reasons as on parents who do so for religious reasons"). Nor did either policy "make any reference to religion or 'a religious practice without a secular meaning discernable from the language or context,'" other than the August 2021 policy's discussion of a religious exemption. *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1177 (9th Cir. 2021) (quoting *Lukumi*, 508 U.S. at 533).

Spivack argues that, if the January 2022 policy controls, it is not neutral because it did not allow religious exemptions. But policies need not permit religious exemptions to be neutral, so long as the lack of an exemption does not reflect policymakers' hostility toward religion. *See We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 272, 282 (2d Cir. 2021) ("*We the Patriots I*") (holding that a vaccine mandate without a religious exemption was neutral), *cert. denied*, 142 S. Ct. 2569 (2022); *Does 1-6 v. Mills*, 16 F.4th 20, 24 (1st Cir. 2021) (same), *cert. denied*, 142 S. Ct. 1112 (2022).

Nor does Krasner's decision to eliminate the August 2021 policy's religious exemptions in the January 2022 policy necessarily undercut the latter policy's neutrality. Our sister circuits have rejected such a categorical rule, which would force policymakers to preserve in amber any religious exemption—no matter how the circumstances justifying it changed—for fear of triggering strict scrutiny. *See We the Patriots II*, 76 F.4th at 149–50. After all, government officials may modify or eliminate religious exemptions for reasons other than "intoleran[ce] of religious beliefs" or a desire to "restrict[] [religious] practices because of their religious

nature." *Fulton*, 593 U.S. at 533.  Maine's legislature, for instance, eliminated a vaccine mandate's religious exemption in response to "declining vaccination rates" among healthcare workers. *Does 1-6*, 16 F.4th at 24.  In a similar vein, Krasner removed the religious exemption here in part out of concern over the then-surging Omicron variant of COVID-19.  Absent evidence of hostility toward religion, he could do so without undermining the policy's neutrality.

There is, however, a dispute of material fact as to whether anti-religious hostility tainted the DAO's treatment of religious exemptions.  That is because a reasonable jury could conclude, based on some evidence in the record, that the DAO's treatment of religious exemptions reflected "intoleran[ce] of religious beliefs." *Fulton*, 593 U.S. at 533.  During Krasner's deposition, Spivack's lawyers asked him why he disagreed with the City's vaccination policy.  He replied:

> Because it presents yet another public safety health obstacle in the middle of an international pandemic within the walls of my office[, and] because it increases the urgency of as many other people in the office as possible being fully vaccinated.  I don't agree with it.  I think that it is very unfortunate that nationally, I'm not, I don't want to throw any rocks at the [C]ity for this, they are dealing with a lot, but it is true across the country that there are some people who are just flat-out unscientific and there are some people who are not as concerned as they really should be for their fellow human beings and, so, we find ourselves in a situation where

we have, basically, people who are denying
science and are endangering others and it's
wrong. One of the things you may not know
from my career is that I have sat in courtrooms
where parents refused to provide medical care
for their children and whose children then died,
[and they] have been convicted of crimes and
sent to jail for that and the law thinks that that's
right and the law thinks that that's correct. Their
basis for denying medical care[,] in some
instances to more than one child after another
who died, one child after another, was their
religious beliefs. Rights are not completely
unlimited. They can't be completely unlimited
and those children lost their lives because their
parents were utterly unscientific in what they
were doing. Government has a role and that role
is to respect, observe[,] and elevate rights, but it
is not to do so in a way that annihilates the
population and kills people.

App. 348–50.

The Supreme Court has repeatedly emphasized "the
State's duty under the First Amendment not to base laws or
regulations on hostility to a religion or religious viewpoint,"
*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S.
617, 638 (2018), and cautioned that the Free Exercise Clause
forbids even "subtle departures from neutrality," *Lukumi*, 508
U.S. at 534. In *Masterpiece Cakeshop*, for instance, it faulted
a commission adjudicating a claim against a religious objector
for "g[iving] every appearance of adjudicating [the] religious
objection based on a negative normative evaluation of the

particular justification for [the] objection and the religious grounds for it." 584 U.S. at 639 (cleaned up). It based this conclusion on a commissioner's statement that disparaged a religious objector's invocation of religious liberty as "one of the most despicable pieces of rhetoric that people can use." *Id.* at 635.

A jury must decide whether similar problems plague Krasner's comments. They could be read to reflect a belief that those seeking a religious exemption are "unscientific" and selfish ("not as concerned as they really should be for their fellow human beings") such that he needed to curtail religious exemptions to prevent religious objectors from "endangering others." App. 349. A reasonable jury could interpret these comments to evince hostility toward religious viewpoints that influenced the DAO's treatment of religious exemptions.

Krasner's comments merit particular scrutiny because he was the primary decisionmaker responsible for the vaccine mandate. Unlike cases in which the policymaker whose statements were under scrutiny "did not have a meaningful role in establishing or implementing the [m]andate's accommodations process," *Kane*, 19 F.4th at 165, or "did not actually issue the vaccination rule" in question, *M.A.*, 53 F.4th at 38, Krasner had authority to set the terms of the mandate and to adjudicate exemption requests.

At the same time, a reasonable jury could find that Krasner's comments are not enough to show that hostility toward religion affected the DAO's treatment of religious exemptions. "Assessing the relevance of statements by public officials to the question of religious animus is often context specific" and "fact-intensive." *Id.* at 37. In the context of the entire record, Krasner's comments could "suggest that [he]

wanted more people to obtain the vaccine out of a deep concern for public health," not because he felt "animosity towards particular religious practices or a desire to target religious objectors . . . *because of* their religious beliefs."  *We the Patriots I*, 17 F.4th at 284; *see M.A.*, 53 F.4th at 38 (observing that even "insensitive" comments could be neutral if they "express[] a concern for the community's health, not a hostility towards religion"); *Kane*, 19 F.4th at 165 (holding that statements expressing a "belief that religious accommodations will be rare" did not raise neutrality concerns).  He began his response by focusing on "public safety . . . within the walls of [his] office," App. 348, and ended it by describing the state's "role . . . to respect, observe[,] and elevate rights" while promoting public health, App. 350.  Rather than disparaging religious practices, his testimony could be read to express the view that rights are not unlimited and that religious liberty, while important, must sometimes yield to other deeply rooted values, like protecting vulnerable people from illness.

    As with the contrary view, some evidence in the record supports this reading.  For one thing, Spivack admitted in her deposition that she never heard from anyone at the DAO that Krasner is hostile to religion.  Krasner testified that he respected Spivack's beliefs and those of other religiously observant people.  And he claimed that his decision to disallow religious exemptions in the January 2022 policy was rooted in respect for religion, because he "d[id] not want to be in a position of judging what people's beliefs are sincere and what people's beliefs are not sincere."  App. 340.[6]  Taken together,

---

[6] Others at the DAO echoed this sentiment, professing respect for Spivack's beliefs and claiming to have never heard anyone in the office disparage them.

this evidence could support a reasonable jury's conclusion that Krasner's statements fail to show that "the mandate was implemented with the aim of suppressing religious belief, rather than protecting the health and safety of . . . staff[] and the community." *San Diego Unified Sch. Dist.*, 19 F.4th at 1177.

In addition, Krasner made his statements about "unscientific" religious beliefs in August 2022, not contemporaneously with the enactment of the August 2021 or January 2022 policies or his adjudication of exemption requests. *See Lukumi*, 508 U.S. at 540 (emphasizing the relevance of the decisionmaker's "contemporaneous statements"). This temporal gap may weaken the inference connecting these comments with any anti-religious sentiment underpinning the treatment of religious exemptions. *See Swartz v. Sylvester*, 53 F.4th 693, 701 (1st Cir. 2022) (distinguishing *Lukumi* based on the timing and content of the policymaker's statements). But it does not eliminate any inference of religious hostility as a matter of law. After-the-fact statements are often probative of past motive, and courts have considered them in their neutrality analyses. *See, e.g.*, *M.A.*, 53 F.4th at 37 (evaluating comments that "were made several weeks after the [policy] was rescinded and in a different context"); *We the Patriots I*, 17 F.4th at 283 (weighing comments made the month after a policy was enacted).

With this backdrop, Krasner's comments are ultimately "susceptible of different interpretations." *Masterpiece Cakeshop*, 584 U.S. at 635. A reasonable jury could find that they evince hostility toward religion that undermines the neutrality of the August 2021 and January 2022 policies. A reasonable jury could also reach the opposite conclusion.

Accordingly, neither party is entitled to summary judgment on neutrality.

## B

Even if a government policy is neutral, it must also be generally applicable to avoid strict scrutiny. A policy is not generally applicable if it either: (1) "invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions"; or (2) "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 533–34 (cleaned up). Spivack claims that the DAO's mandate fails in both respects.

### 1

Spivack first argues that the vaccine mandate is not generally applicable because it allowed for discretionary exemptions. Whether she is right depends on which version of the mandate controls.

The August 2021 policy provides for two exemptions: a medical exemption for employees with "medical condition[s] that [are] a contraindication to the COVID-19 vaccine" and a religious exemption for "employees with verifiable, sincerely held religious beliefs, observances, or practices that conflict with getting vaccinated." App. 52.[7] It also states that "[t]he DAO makes determinations about requested accommodations

---

[7] The August 2021 policy also sets out a disability exemption, which appears to be subsumed under the broader medical exemption.

and exemptions on a case-by-case basis considering various factors and based on an individualized assessment in each situation." *Id.*

These exemptions are different from the open-ended exemptions that courts have held trigger strict scrutiny. *See Fulton*, 593 U.S. at 535 (holding that strict scrutiny applied because the policy allowed an official to grant exemptions at "his/her sole discretion"); *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) (Alito, J.) (holding that an exemption for "hardship" or "extraordinary circumstances" required strict scrutiny); *see also Sherbert v. Verner*, 374 U.S. 398, 401 (1963) (evaluating a "good cause" exemption). Unlike the defined exemptions here, those exemptions contained no criteria meaningfully cabining an official's discretion. *See Fulton*, 593 U.S. at 536 (characterizing the exemption in that case as "entirely discretionary").

Still, the August 2021 policy—and evidence of that policy in operation, including the multi-question form Spivack completed in December 2021—makes clear that Krasner had significant discretion to evaluate religious exemption requests. *See Kane*, 19 F.4th at 169 (holding that a policy was not generally applicable when officials "reviewing . . . requests for religious accommodations had substantial discretion over whether to grant those requests" and applied standards inconsistently). Under one interpretation of the record, he used that considerable discretion to deny Spivack's request. A reasonable jury could conclude, in other words, that the DAO created, on paper, a mechanism for individualized exemptions but then, in practice, declined "to extend [it] to cases of

religious hardship." *Fulton*, 593 U.S. at 535 (internal quotation marks omitted). This practice would trigger strict scrutiny.[8]

---

[8] The mere provision of a religious exemption does not itself trigger strict scrutiny. *See Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) ("[A policy with a religious exemption] goes beyond what the Constitution requires."). Even when not constitutionally required, religious exemptions are "part of a mutually beneficial play in the joints between the Establishment Clause and Free Exercise Clause." *We the Patriots II*, 76 F.4th at 150 (cleaned up). What *does* trigger strict scrutiny, however, is a policy of individualized, discretionary exemptions in which a government official may unilaterally evaluate "the particular reasons for a person's conduct." *Fulton*, 593 U.S. at 533; *see also Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1273 (10th Cir. 2024) (holding that a policy was not generally applicable when the government "considered the particular reasons underlying the applicant's religious beliefs and provided individualized exemptions to applicants whose religious beliefs, in [its] discretion, justified an exemption" (cleaned up)); *We the Patriots I*, 17 F.4th at 290 n.29 (observing that a general-applicability problem may arise when a policy "afford[s] so much discretion to rule on individual cases, and so few standards govern[] the exercise of that discretion, as to leave room for the [government] to apply potentially discriminatory standards" (citing *Dahl v. Bd. of Trustees of W. Mich. Univ.*, 15 F.4th 728 (6th Cir. 2021) (per curiam))). We do not doubt that government actors need to engage in some level of review to evaluate religious exemption requests and are entitled to confirm that such requests stem from a sincerely held religious

But Krasner claims that Spivack was disciplined under a later policy—the January 2022 policy, which eliminated the religious exemption altogether and kept only the medical exemption. He testified that he did not engage in individualized review of religious exemption requests and that religious exemptions were unavailable as a matter of policy—that is, he lacked any discretion over those requests—by the time Spivack's request was denied.[9]

That Krasner continued to evaluate medical exemption requests under the January 2022 policy does not undermine that policy's general applicability. Medical exemptions were a separate and objectively defined category of exemption

---

belief. *Frazee v. Ill. Dep't of Emp. Sec.*, 489 U.S. 829, 833 (1989) (acknowledging the "difficulty of distinguishing between religious and secular convictions and . . . determining whether a professed belief is sincerely held"); *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("[T]o have the protection of the Religion Clauses, the claims must be rooted in religious belief."). But a reasonable jury could conclude that the DAO's August 2021 policy, including the December 2021 exemption form, authorized "individualized assessments" with no apparent guidelines or guardrails. App. 52. Should the jury reach that conclusion, strict scrutiny would apply.

[9] Though Spivack invokes Krasner's discretion to grant or deny exemption requests, that argument conflates his power as DA to administer his office with the terms of the policy. It is undisputed that Krasner had significant authority to manage the DAO and set officewide policies, including vaccination policies. But the terms of the January 2022 policy meant that he no longer could evaluate religious exemption requests on an individualized basis.

28

requests.  *See We the Patriots I*, 17 F.4th at 288–89 (holding that a medical exemption was not an individualized, discretionary exemption); *We the Patriots II*, 76 F.4th at 150–51 (explaining that medical objections do not afford the government meaningful discretion); *Does 1-6*, 16 F.4th at 30 (holding that a "single objective exemption" did not undermine general applicability).  With the January 2022 policy, Krasner divested himself of discretion to evaluate employees' religious exemption claims, and maintained a separate, narrow medical exemption with objective criteria.

But whether Krasner evaluated Spivack's request under the January 2022 policy or the August 2021 policy remains a dispute of material fact.  The District Court held that Spivack was subject to the January 2022 policy.  There is, no doubt, significant evidence supporting that conclusion.  Krasner testified that he did not perform an individualized assessment of the religious exemption requests and that he updated the policy before reviewing any.  Madden—Krasner's main advisor on COVID-19 policy—confirmed that account, claiming that the policy had changed and that, as a result, no one performed an individualized assessment of Spivack's exemption request.

Yet evidence in the record could lead a reasonable jury to find that Spivack's exemption request was considered under the earlier policy.  For one thing, the January 2022 policy was unwritten and was never communicated in any form to DAO staff.  This omission was notable because the DAO typically informed its employees of changes to its COVID-19 policies in writing.  Nothing in the record explains this striking oversight.  And Listenbee, the First Assistant DA, testified that the August 2021 policy—including its individualized religious

exemption process—was still in effect when Krasner denied Spivack's exemption request.[10]    A reasonable jury could conclude, therefore, that Krasner's January 2022 decision to deny all religious exemptions was not a new "policy" at all, but rather an exercise of his nearly unbridled discretion under the August 2021 policy.[11]  There is thus a dispute of material fact as to which policy controlled and, by extension, whether the policy provided for individualized exemptions at Krasner's discretion.

2

Spivack next argues that the vaccine mandate is not generally applicable because it "prohibits religious conduct while permitting secular conduct that undermines the

---

[10] Krasner urges us to discount this testimony, arguing that Listenbee was unaware of the changed policy.  But it is for the jury—not a court at the summary judgment stage—to assign the proper weight to this evidence.

[11] Krasner's conflicting testimony illustrates this point.  Some of his testimony suggests that the August 2021 policy never went away, and that he maintained discretion to grant individual religious exemption requests.  He claimed, for instance, that if Spivack had requested a remote work arrangement, "that is something that would have been seriously considered in retrospect; that is something that we would have granted."  App. 301.  But, in the same deposition, he also said that the "categorical decision" not to grant religious exemptions "was a final decision," App. 304, and that employees "are not being hired anymore with consideration of a religious accommodation," App. 275.  A jury must evaluate this evidence at trial.

government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. She claims that two carveouts from the mandate violate this rule: its exclusion of unionized DAO employees, and its medical exemption. But neither carveout undermines the government's asserted interests like a religious exemption would.

i

We can make quick work of the carveout for unionized employees. The record is clear that the August 2021 and January 2022 policies did not apply to unionized DAO employees because Krasner had no authority to require that they be vaccinated. Instead, those employees were subject to separate vaccination requirements—along with separate exemption processes—set out in collective bargaining agreements between their unions and the City. Krasner testified that he would have included unionized employees in the mandate if he could have, and he even expressed frustration about their exclusion. He cannot be faulted for complying with collective bargaining agreements that he had no role in negotiating or implementing. *Cf. Kane*, 19 F.4th at 165 (considering the policymaker's role and authority in the *Smith* analysis).[12]    Because Krasner lacked authority to set

_____

[12] Spivack contends that the Ninth Circuit's decision in *Bacon v. Woodward* supports a contrary conclusion. 104 F.4th 744 (9th Cir. 2024). The complaint in that case alleged that the City of Spokane required its firefighters to be vaccinated and denied all religious exemption requests. At the same time, Spokane used firefighters from neighboring towns—some of which granted exemptions to their respective vaccine requirements—

vaccination policy for unionized employees, their exclusion from the August 2021 and January 2022 policies does not undermine either policy's general applicability.

---

for backup services within its city limits through mutual aid agreements. *Id.* at 748. The majority of the panel held that the complaint plausibly alleged a Free Exercise Clause violation because Spokane's implementation of the policy was not generally applicable: it "exempted certain firefighters based on a secular criterion—being a member of a neighboring department—while holding firefighters who objected to vaccination on purely religious grounds to a higher standard." *Id.* at 751. The third panel member disagreed, concluding that "[t]he complaint alleges that [Spokane] applied the [policy] to [its] employees uniformly" and that other towns' choices to adopt different policies did not disturb the general applicability of Spokane's policy. *Id.* at 754 (Hawkins, J., dissenting). The dissent's reasoning applies here. Krasner set vaccination policy for the only group he could: the at-will employees. He cannot be held responsible for the inevitable reality that the DAO's at-will employees will interact with other people (i.e., members of the police union and the public employee union) whose vaccination statuses are governed by other decisionmakers' policies. And to the extent that the *Bacon* majority relied on the fungibility of firefighters from Spokane and the neighboring towns, *see id.* at 751 (stating that, by terminating its own unvaccinated firefighters, Spokane effectively chose to use other towns' unvaccinated firefighters to "fill the gap[]"), no such dynamic exists here. Nothing in the record suggests that terminated at-will DAO employees will be replaced by unionized employees.

ii

The medical exemption requires closer examination. Under the August 2021 policy, employees were exempt if they had "any . . . medical condition that is a contraindication to the COVID-19 vaccine." App. 52. The January 2022 policy applied a similarly objective but slightly more stringent standard, exempting employees who could "demonstrate[] that the vaccine presented a verified risk of serious illness or death." App. 487.

The critical question is whether the medical exemptions in these policies are comparable to a religious exemption—in other words, whether the "preferential treatment of secular behavior" in the form of a medical exemption "affect[s] the regulation's purpose in the same way as the prohibited religious behavior." *Lighthouse Inst.*, 510 F.3d at 266. "[T]reat[ing] *any* comparable secular activity more favorably than religious exercise" is enough to violate the general-applicability prong of *Smith* and trigger strict scrutiny. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). And "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* So we must determine (1) what the government's asserted interests are, and (2) whether the medical exemption undermines those interests like a religious exemption would.

At the first step, Spivack and Krasner put forward competing characterizations of the government's interests. Krasner says that the mandate advances the DAO's interests in employee and public health and safety. Spivack, by contrast, urges us to treat reducing the spread of COVID-19 in the office as the relevant interest.

We reject Spivack's cramped characterization of the DAO's interests. For one thing, our focus on "the *asserted* government interest," *Tandon*, 593 U.S. at 62 (emphasis added), indicates that we give some deference to how the government characterizes its own interests. While we need not credit interests that lack support in the record (or those that the record reveals are pretextual), our analysis must acknowledge the government's prerogative to decide which interests to emphasize in policymaking. *See We the Patriots I*, 17 F.4th at 285 ("Plaintiffs do not point to any evidence suggesting that the interests asserted are pretextual or should otherwise be disregarded . . . ."); *We the Patriots II*, 76 F.4th at 151–52 (accepting a government interest because it was supported by the record and was not pretextual); *San Diego Unified Sch. Dist.*, 19 F.4th at 1178 n.5 (focusing on "the interest the [government] emphasizes most frequently in the record"). We also must account for the reality that the government often acts for several interrelated reasons. *Does 1-6*, 16 F.4th at 31 (crediting the state's multiple, "mutually reinforcing" interests); *We the Patriots II*, 76 F.4th at 152 n.20 (explaining that "it is not contradictory" for the government to focus on multiple related interests). We will therefore consider all legitimate interests asserted by the government, so long as the record supports them.

Under this standard, there are three interconnected government interests that the DAO's policies further: (1) preventing the spread of COVID-19, (2) ensuring adequate staffing in the office, and (3) protecting the health and safety of DAO employees and the public. Though we disaggregate these interests for clarity, they are mutually reinforcing: the DAO wanted to suppress the spread of a harmful infectious disease to protect the health of its employees and their loved

ones, the people they interact with in the criminal justice system, and the public; and to prevent an outbreak that could hobble the office.

All these interests have ample support in the record. Krasner repeatedly testified about his concern for employee and public health, his desire to make the workplace as safe as possible and prevent COVID-19 outbreaks, and his belief that employee absences would affect the functioning of the office. The text of the August 2021 policy confirms these interlocking concerns, proclaiming that "[t]he DA's office is setting a higher standard of health and safety due to the nature of our work, which requires many of us to work indoors and to interface with the public on a regular basis in our roles as public servants." App. 51. No evidence suggests that any of these interests are pretextual, post hoc rationalizations.

Considering this array of interests, we can draw "a principled distinction . . . between the prohibited religious behavior and its secular comparator in terms of their effects on" those interests. *Lighthouse Inst.*, 510 F.3d at 266. Unlike a religious exemption, a medical exemption furthers the DAO's interest in keeping its employees safe and healthy by allowing employees for whom the COVID-19 vaccine would cause death or illness to abstain from vaccination. *See* App. 333 ("[A]llowing [the recipient of a medical exemption] that exemption goes directly to our goal rather than against it."). We join several of our sister circuits in recognizing this common-sense distinction. *Does 1-6*, 16 F.4th at 34; *We the Patriots I*, 17 F.4th at 285; *We the Patriots II*, 76 F.4th at 153; *San Diego Unified Sch. Dist.*, 19 F.4th at 1178. After all, the DAO "would hardly be protecting its [employees] if it required

them to accept medically contraindicated treatments." *Does 1-6*, 16 F.4th at 34.[13]

Our own general-applicability precedent supports this conclusion. Consistent with the Supreme Court's guidance, we have repeatedly held that a policy's general applicability turns on whether it treats similar religious and secular behavior similarly. In *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, for instance, we found that a police department's facial hair prohibition was not generally

---

[13] In addition, the record indicates that a religious exemption would undermine the government's interest in preventing the spread of COVID-19 and maintaining adequate staffing to a greater extent than a medical exemption. *See Blackhawk*, 381 F.3d at 209 (comparing the "degree" to which religious and secular exemptions undermine the purpose of a policy); *We the Patriots I*, 17 F.4th at 285–86 (considering whether secular exemptions are "at least as harmful" to the purpose of a policy as religious exemptions). Religious exemption requests outnumbered medical exemptions eight to one. Exemption requests for unionized employees, which were adjudicated by the City, reveal a similar trend. As a result, far more employees would be exempt from vaccination under a religious exemption than under a medical exemption, increasing the risk of spreading COVID-19 and causing an outbreak in the office. *See We the Patriots I*, 17 F.4th at 287 (considering the relative number of religious and medical exemptions in the comparability analysis); *San Diego Unified Sch. Dist.*, 19 F.4th at 1178 (same); *Lowe v. Mills*, 68 F.4th 706, 715 (1st Cir. 2023) ("[I]t may be that medical exemptions are likely to be rarer, more time limited, or more geographically diffuse than religious exemptions . . . .").

applicable. 170 F.3d 359 (3d Cir. 1999) (Alito, J.). The department said that it could not exempt officers who wished to grow beards for religious reasons because it wanted its officers to have a uniform, clean-shaven look. *Id.* at 360. But it offered a medical exemption to officers with skin conditions, whose beards broke with the department's desired uniformity just like religious objectors' would. *Id.* at 366. The department claimed that religious behavior would undermine its interest in aesthetic uniformity, but then permitted secular conduct that did just that.[14]

The same problem afflicted a town's anti-sign ordinance in *Tenafly Eruv Association v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002). Citing the ordinance, the town prohibited religious markers on telephone poles while maintaining a de facto exemption for holiday decorations, lost-dog posters, and other neighborhood notices. *Id.* at 151.

---

[14] Some have read *Fraternal Order of Police* to create a blanket rule that medical exemptions render a policy not generally applicable. *See Bd. of Regents of Univ. of Colo.*, 100 F.4th at 1277 (citing *Fraternal Order of Police* to hold that "a government policy that grants an exemption for medical reasons but denies the same exemption for religious reasons is not generally applicable" (internal quotation marks omitted)). That interpretation vastly overstates the case's holding. We held that the medical exemption at issue triggered strict scrutiny only because it "undoubtedly undermine[d]" the government's asserted interest in the same way a religious exemption would. *Fraternal Ord. of Police*, 170 F.3d at 366; *see also Does 1-6*, 16 F.4th at 33 (distinguishing *Fraternal Order of Police* on this basis); *We the Patriots II*, 76 F.4th at 154 (same).

Though it claimed that religious markers would cause visual clutter, the town did not forbid the equally obtrusive secular signs. *Id.* at 167–68. Because the ordinance carved out secular behavior while prohibiting comparable religious behavior, we held that it was not generally applicable.

We repeated this rule in *Blackhawk v. Pennsylvania*, 381 F.3d 202 (3d Cir. 2004) (Alito, J.). In that case, Pennsylvania declined to grant religious exemptions to a law that imposed an annual fee on anyone keeping wild animals in captivity. *Id.* at 205. But the state exempted zoos and circuses from the fee regime, which undermined its interests in raising revenue and discouraging citizens from capturing wild animals just as much as a religious exemption would. *Id.* at 211.

We applied this same reasoning but reached the opposite result in *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253 (3d Cir. 2007). There, a city declined to grant a religious exemption to a zoning ordinance, but exempted restaurants, retail stores, and other businesses. *Id.* at 276. The church that was denied an exemption argued that the ordinance was not generally applicable. But we rejected that argument: unlike a religious exemption, the exemption for restaurants and similar businesses *furthered* the ordinance's purpose of revitalizing the city's downtown area. *Id.*

The lesson of these cases is clear. When the government says that it cannot exempt religious exercise from a policy because doing so would undermine an important interest, but then exempts other groups or actions that undermine that same interest in the same way, its arbitrary distinction between religious and secular behavior raises an inference that it has targeted religious practice for distinctive

treatment. But when a religious exemption would affect the government's interests in a different way or to a greater extent than another type of exemption, we draw no such inference.

That is the case here. Both the August 2021 and January 2022 policies applied to all employees over whom Krasner had policymaking authority, with a narrow, objectively defined exemption for employees whose health the vaccine would endanger. The DAO carved out that minor exemption to further—not undercut—its interest in employee health and safety. The medical exemption therefore does not undermine either policy's general applicability.[15]

## C

On remand, a jury must resolve which policy Krasner used when he denied Spivack's religious exemption request

---

[15] This conclusion aligns with *Jacobson v. Massachusetts*, which held that a vaccine mandate with only a limited medical exemption was constitutional under a standard akin to rational basis review, 197 U.S. 11, 12, 25 (1905), and which is still good law, *see Child.'s Health Def., Inc. v. Rutgers, the State Univ. of N.J.*, 93 F.4th 66, 80 (3d Cir. 2024) (concluding "that *Jacobson* controls" and that "[t]he [Supreme] Court's more recent pronouncements confirm [its] vitality"); *Phillips*, 775 F.3d at 543 (citing "persuasive dictum" from *Jacobson* to hold that "mandatory vaccination as a condition for admission to school does not violate the Free Exercise Clause"); *Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017) (citing *Jacobson* for its holding that "compulsory vaccination laws with only medical exemptions do not violate any federal constitutional right").

and, by extension, whether the applicable policy provided for discretionary, individualized exemptions. The jury must also decide whether the policy was neutral given Krasner's deposition testimony. The answers to these questions govern the applicable standard of scrutiny.

If the DAO's vaccine mandate is both neutral and generally applicable, it is subject to rational basis review. Under this deferential standard, a government action is constitutional if it is "rationally related to a legitimate government objective." *Tenafly Eruv Ass'n*, 309 F.3d at 165 n.24.

Both the August 2021 and January 2022 policies would easily meet this standard. All the interests put forward by the DAO—protecting employee and public health, preventing the spread of COVID-19, maintaining staffing levels to ensure the proper functioning of the DAO and the criminal justice system—are legitimate. And both policies are rationally related to those objectives because they ensure that a greater proportion of the office is vaccinated and therefore less likely to contract and spread the virus, experience severe illness, or miss work. *See We the Patriots II*, 76 F.4th at 156 (holding that a vaccine mandate without a religious exemption is rationally related to the government's interest in public health "because it seeks to maximize the number of [people] . . . vaccinated").

By contrast, if the mandate is not both neutral and generally applicable, strict scrutiny applies. Under this demanding standard, "[a] government policy can survive . . . only if it advances interests of the highest order and is narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (cleaned up). "Put another way, so long as the

government can achieve its interests in a manner that does not burden religion, it must do so." *Id.*

The interests advanced by the August 2021 and January 2022 policies are compelling. "Stemming the spread of COVID-19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020). So are the related interests of "protecting public health against a deadly virus," *Does 1-6*, 16 F.4th at 32, and ensuring adequate staffing of an essential government office.

But the Supreme Court has instructed us not to frame government objectives "at a high level of generality"—instead, we "must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 593 U.S. at 541 (cleaned up). "The question, then, is not whether the [DAO] has a compelling interest in enforcing its [vaccination] policies generally, but whether it has such an interest in denying an exception to [Spivack]." *Id.* Relatedly, the DAO must show that its policy was narrowly tailored, which "requires the government to demonstrate that a policy is the least restrictive means of achieving its objective." *Kane*, 19 F.4th at 169 (cleaned up).

A jury must determine whether Krasner has cleared this high bar. The record reveals that Krasner considered alternatives to a vaccine mandate as a general matter—that is, for all DAO employees—and determined that they would be insufficient. But it does not resolve whether the DAO could have accommodated Spivack or other similarly situated religious objectors. *See Lowe*, 68 F.4th at 718 (holding that a document discussing alternatives to a vaccination requirement

in general terms did not satisfy strict scrutiny).[16] Unanswered factual questions pervade this inquiry. How many similar exemption requests would the DAO need to grant? Would other, less restrictive mitigation measures for employees with religious exemptions (like giving them their own offices, enforcing a masking requirement, or imposing a testing regime only for exempt employees) have achieved the office's objectives? If strict scrutiny applies, a jury must consider these questions and decide whether denying Spivack and others like her religious exemptions was narrowly tailored to serve a compelling interest.

*     *     *

For the reasons set forth above, we will vacate the District Court's order and remand the case for trial.

---

[16] Like the Second Circuit, we reject the notion "that the Supreme Court's precedents require[] us to confine our analysis to . . . each unvaccinated individual." *We the Patriots II*, 76 F.4th at 152 (cleaned up); *see also Lowe*, 68 F.4th at 716 (agreeing with the Second Circuit on this point). Government officials make policy in the aggregate. If the DAO granted Spivack an exemption, it would presumably grant the same exemption to similarly situated religious claimants. We may therefore consider the cumulative effect of such a policy in the strict scrutiny analysis.